## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

IN RE: RETEK INC. SECURITIES, *et al.*          Civil No. 02-4209 (JRT/SRN)

                                                 **ORDER**

_____


David R. Stickney, BERNSTEIN, LITOWITZ, & GROSSMAN, 12544 High Bluff Drive, Suite 150, San Diego, CA 92130; Sylvia Wahba, MILBERG, WEISS, BERSHAD, HYNES & LERACH, 401 B Street, Suite 1700, San Diego, CA 92101-5050; and Richard A. Lockridge, LOCKRIDGE GRINDAL & NAUEN, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401, for plaintiffs.

James E. Burns, Jr. and Richard L. Gallagher, CLIFFORD CHANCE, One Market Street, Suite 800, San Francisco, CA 94105; and Allen W. Hinderaker, MERCHANT & GOULD, 80 South Eighth Street, Suite 3200, Minneapolis, MN 55402, for defendants.


This is a class action lawsuit alleging securities fraud against Retek Inc. ("Retek") and against five individuals alleged to be insiders of Retek (collectively "insider defendants").[1]  On February 14, 2003, Louisiana Municipal Police Employees' Retirement System and Steven B. Paradis were appointed Lead Plaintiffs, pursuant to Section 21D of the Exchange Act, for the class of shareholders who purchased stock in

_____

[1] Specifically, the insider defendants are John Buchanan, Chairman of Retek's Board of Directors and former Chief Executive Officer; Steven D. Ladwig, Chief Executive Officer of Retek during the class period; Gregory A. Effertz, Senior Vice President and Chief Financial Officer; Jeremy P.M. Thomas, Chief Technology Officer; and James B. Murdy, Retek's Controller.

Defendant Retek's corporation ("class plaintiffs") between July 19, 2001 and July 8, 2002 (the "class period").

In their complaint, plaintiffs allege that Retek, acting through the insider defendants, made materially false statements and omissions during the class period that artificially inflated the value of its stock, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  Plaintiffs claim that each of the insider defendants is individually liable under these provisions as direct participants in the fraud, because "[t]hrough their positions of control and authority as officers, each of the insider defendants was able to and did control the content of the public statements disseminated by Retek." (Compl. ¶ 104.)  Plaintiffs further allege that each of the insider defendants are liable under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as "a controlling person of Retek" with "power and influence . . . to engage in illegal conduct" and therefore "a culpable participant in the fraud [it] perpetrated." (Compl. ¶¶ 112-17.)

Defendants filed a motion to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(6) for failure to adequately plead all the elements of a claim for securities fraud.  In particular, defendants argue the complaint does not plead fraud and scienter with sufficient particularity to comply with the heightened pleading requirements imposed on private securities litigants by Section 21D(b) of the Exchange Act, 15 U.S.C. § 78u-4(b), enacted as part of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Defendants also attack the Complaint for failure to adequately plead that their alleged misstatements were material or that they caused plaintiffs' losses, and argue

that most of their alleged misstatements are protected by a safe harbor for forward looking statements created by Section 21E of the Exchange Act, 15 U.S.C. § 78u-5, also enacted as part of the Reform Act.  Finally, defendants argue that the complaint does not adequately plead that Chief Technology Officer Jeremy Thomas knowingly made false statements in his individual capacity, or that he possessed the power to prevent the alleged misstatement, and that the claims against him cannot stand. For the reasons set forth below, defendants' motion is granted in part, and plaintiffs' complaint is dismissed without prejudice, with leave to amend.

## BACKGROUND
### (Plaintiffs' Allegations)

For the purpose of a motion to dismiss, facts in the complaint are assumed to be true.  *In re Navarre Corp. Sec. Litig.,* 299 F.3d 735, 738 (8th Cir. 2002).  Retek is a fifteen-year-old company that develops and markets supply chain software to retail companies.

On July 8, 2002, the last day of the class period, Retek issued a press release announcing that it had failed to close more than $30 million worth of licensing contracts it had anticipated would close during the second quarter of 2002, and accordingly adjusted downward several predictions it had made for the following quarter.  In addition, Retek withdrew its guidance for the 2003. Retek explained its shortfall, saying, "The Company saw sales cycles extend as a result of working with larger customers that have more complex and lengthy procurement processes." (Compl. at 33.)  The press release quoted insider defendant Ladwig as saying, "We are disappointed with the volume of

new business signed in the second quarter, although we expect most of the business that was pushed out of the second quarter will be closed later this year." (*Id.*)  It seems the market was also disappointed.  July 9, the day after the press release was issued, Retek's stock plummeted from $17.31 to $6.46 per share.

Plaintiffs allege that beginning July 19, 2001, defendants made a series of materially false and misleading statements that artificially inflated the value of Retek's stock.  The gravamen of the complaint is that while the company consistently touted "a strong sales pipeline" throughout the class period, by mid-2001 insiders at Retek knew the facts they ultimately disclosed on July 8, 2002:  that their sales pipeline was weak, their sales cycle was lengthening, and their customers were wanting more for less. According to plaintiffs, the "key to Retek's clear visibility" was its ratable revenue recognition model,[2] which gave management "great visibility into future quarters." (*Id.* ¶¶ 6, 31.)  Plaintiffs claim that the ratable revenue recognition model enabled Retek to continue reporting an increase in revenue, giving the outward appearance of growth, while in fact the company was experiencing downward trend in new business. (*Id.* ¶ 33.)

Within this general context, plaintiffs point to a number of misstatements with respect to revenue from specific accounts.  First, they allege Retek's revenue reported on

_____

[2] In a typical contract granting a retail customer a license to its software, Retek would provide "technical advisory services" for a specified term, generally between twelve and thirty-six months. Unlike its competitors, which recognize the revenue from a contract at the time the product is shipped, Retek uses a "ratable" revenue recognition model. This means that the revenue from a contract in recognized in equal parts throughout the term of the technical advisory contract. For example, if a two million dollar licensing contract is signed with a technical advisory period of 24 months, Retek would recognize $250,000 in revenue for each quarter for two years.  Similarly, according to plaintiffs, Retek would sometimes modify software code for a specific customer, in which case it recognizes revenue using a "percentage-of-completion" method, recognizing revenue as certain milestones are met.

July 19, 2001 was misstated because it included revenue prematurely recognized from one of their largest contracts.  Retek had signed a $20 to $28 million "percentage-of-completion" contract with A&P, a grocery store chain, and by the end of the second quarter of 2001 (2Q 01) they had completed 30% of this contract.  (*Id.* ¶¶ 43, 44.) Plaintiffs allege that, to conceal a revenue shortfall, two of the insider defendants (Effertz and Buchanan) created documents to make it appear that 70% of the work had been completed, allowing them to recognize $12 million –about $7 million more than legitimately should have been recognized.[3]  (*Id.*)  By prematurely counting the A&P revenue, Retek violated the Generally Accepted Accounting Principles ("GAAP") and its own stated accounting policy.  (*Id.* ¶ 50.)

Retek's 10-Q for 2Q 01 reports total revenue of about 43 million, meaning that plaintiffs allege nearly a 20% overstatement for this quarter.[4]  Plaintiffs claim this number was materially overstated due to the premature recognition of revenue from the A&P contract, and further claim Retek's statement that its 10-Q was prepared in accordance with GAAP was materially false.  (*Id.*)  Plaintiffs claim that the fraudulent nature of the 10-Q numbers discussed at an executive meeting in June, 2001, during

---

[3] Defendants' argue that plaintiffs fail to allege how much of the $12 million was overstated. (Motion to Dismiss at 3). In fact a little math reveals that if 70% of the contract was $12 million, then the contract was for approximately $17 million (slightly outside the alleged range of the contract value). 30% of $17 million is about $5 million, meaning that defendants allegedly overstated by approximately $7 million.

[4] Subtracting $7 million from their $43 million total revenue means they would have reported $36 million in revenue had they not inflated their A&P revenue. $36 million increased by 20% (multiplied by 120%) is about 43 million.

which Effertz and Thomas are alleged to have admitted that reported numbers from 2Q 01 were inaccurate.[5]  (*Id.* ¶ 45.)

Second, plaintiffs allege that during much of the class period, defendants hyped a high profile alliance agreement with IBM to market Retek software applications on IBM infrastructure knowing that it was unlikely to generate significant revenue.  Plaintiffs claim Retek stated the IBM alliance "would bring over 1 billion in revenues."  (*Id.* ¶ 35.) The agreement required Retek to switch its software platform from Oracle to IBM. Plaintiffs claim that under pressure from an existing partner, Retek made an internal decision not to transfer its largest application to the IBM platform, so that, "unbeknownst to investors, the IBM alliance was a failure and dead as of October 2001."[6]  Nonetheless, Retek continued to promote the IBM alliance to investors through analysts, who enthusiastically inquired about the status of the agreement.  For example, on October 17, 2001, Ladgwig and Effertz participated in a conference call, answering a question about IBM's impact on 4Q 01 "bookings"[7] stating, "On [the] IBM relationship, we continue to be pleased with the progress we are making there . . . [and] we continue to see more activity involved in the pipeline with IBM."  (*Id.* ¶ 53.)  Further, in a conference call on January 22, 2002, Retek responded to an analyst's query about whether IBM specifically

---

[5] Specifically, Effertz is alleged to have admitted that the books were doctored and that he would not do it again, to which Thomas is alleged to have exclaimed, "Now we're involved in fraud!"  (*Id.* ¶ 45.)

[6] Plaintiffs claim that "Accenture, an existing alliance partner, opposed any such move to the IBM platform . . . [and] gave Buchanan an ultimatum in September 20001: "Dump IBM or we'll dump Retek." (*Id.* ¶ 36.)

[7] Bookings are new software licensing contracts.

had impacted the revenue for 2001, stating "yes, we do see IBM coming down. We continue to strengthen that relationship." (*Id.* ¶ 62.) Plaintiffs claim these, and other statements about IBM made after October 2001 were materially misleading, in light of Retek's decision not to convert its largest product to the IBM platform.

Third, plaintiffs allege Retek had a number of difficulties with specific customers that it failed to report to the market. Specifically, plaintiffs allege Retek included in its deferred revenue for 1Q 02 issued on April 18, 2003, revenue from a joint venture with Multi-Asia, Inc. (MAI), abandoned in February, (*id.* ¶ 77(d)), that Retek issued a press release promoting AOL as a client after AOL was in the process of terminating at least some portion of their service, (*id.* ¶ 77(b)), and that throughout much of the class period Retek was losing $200,000 a month on a failed partnership contract with Performance Retail Inc (PRI) (though plaintiffs do not allege Retek made specific statements about the PRI deal). (*Id.* ¶¶ 55(c), 64(c), 82(c).)

Finally, plaintiffs allege that throughout the class period defendant made statements to the market, in their SEC filings, in press releases, and in conversations with analysts, emphasizing the strength of their sales pipeline. Plaintiffs cite analyst reports issued throughout the class period, which purport to be based on information from Retek management, reporting positive revenue indicators. For example, during the class period Retek stated that its bookings were trending upward (*id.* ¶ 65), and that Retek's "pipeline remains rich with moderately improving close rates" (*id.* ¶ 67). CFO Greg Effertz stated that he saw "a healthy sales pipeline" as late as May 16, 2002. (*Id.*) Plaintiffs also cite conference calls to similar effect. Plaintiffs claim such optimistic statements were

materially false and misleading in light of the "fact" that by 3Q 01 Retek's sales cycle was lengthening, deals forecast to close were being postponed, and customers had smaller budgets and were demanding more concessions.  (*Id.* ¶ 55.)  Plaintiffs further allege these were "known trends . . . events, or uncertainties" that were reasonably likely to materially impact Retek's revenue within the meaning of Item 303 of Regulation S-K, 17C.F.R. §§ 229.303  *et seq.*, such that Retek had a duty to discuss it in its SEC filings.  (Compl. ¶¶ 56, 72, 78.)

In addition to the above alleged misstatements, plaintiffs claim that 4 of the 5 insider defendants sold between 90% and 100% of the shares of Retek stock they were holding during the class period.[8] (*Id.* ¶ 92.)

## ANALYSIS

### I.     SECTION 10(b) AND RULE 10b-5

Section 10(b) of the Exchange Act makes it unlawful for a person "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate."   15 U.S.C. 78j(b) (2000). Pursuant to this section, the SEC enacted Rule 10b-5, which makes it unlawful for a person, directly or indirectly,

  a)  T o employ any device, scheme, or artifice to defraud,

---

[8] CEO Ladwig is not alleged to have sold any of his Retek shares during the class period.

b) To make any untrue statement of a material fact or to omit to state a material fact necessary to make the statement made, in light of the circumstances in which it was made, not misleading, or

c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of a security.

15 C.F.R. § 240.10b-5.

There are five elements of a successful 10b-5 claim. Plaintiff must demonstrate (1) misrepresentations or omissions of material fact that operated as a fraud or deceit; (2) causation, often analyzed in terms of materiality and reliance; (3) damages; (4) fraudulent activity in connection with the purchase or sale of a security, and (5) scienter, or intent to deceive, manipulate, or defraud. *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 741 (8th Cir. 2002) (citations omitted) (noting that scienter is an essential element of a 10b-5 claim although not explicitly mentioned in the text of the rule).

## II.    HEIGHTENED PLEADING STANDARD

Private actions alleging securities fraud, brought under Rule 10b-5 and Section 10(b), are subject to special pleading standards under Section 21D(b)(1), adopted by Congress as part of the PSLRA. Section 21D(b) sets two heightened pleading requirements.[9] First, a complaint must specifically plead the facts giving rise to defendant's fraud. 21D(b)(1) provides that "the complaint shall specify each statement alleged to have been misleading" and give "the reason or reasons why the statement is

---

[9] Although before the PSLRA was enacted courts considered complaints alleging securities fraud under the heightened pleading standard for fraud set forth in Rule Federal Rule of Civil Procedure 9(b), the heightened pleading standard of the PSLRA supersedes Rule 9(b) so that only analysis under the PSLRA is necessary. *Navarre*, 299 F.3d at 742.

misleading." 15 U.S.C. § 78U-4(b)(1). Section 21D(b)(1) further provides that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* Courts have interpreted "information and belief" to encompass all allegations not plead on the basis of personal knowledge. *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 984 (9th Cir. 1999); *Feasby v. Industri-Matematik Int'l Corp.*, No. 99 Civ.8761 LTS JCF, 2003 WL 22976327, at *4 (S.D.N.Y. December 19, 2003); *see also In re Green Tree Financial Corp. Options Litig.*, 61 F. Supp. 2d 860, 872 ( D. Minn. 1999), *rev'd on other grounds*, *Florida State Board of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 654 (2001) (subjecting items plead "on investigation of counsel" to the particularity requirement applied to items plead "on information and belief").

There is relatively little authority in this Circuit as to what the PSLRA requires of plaintiffs who do not plead on the basis of personal knowledge. One court has interpreted this last clause of Section 21D(b)(1) to mean that "[p]laintiffs are required to disclose the sources of their factual allegations" when pleading on information and belief." *In re Eng'g Animation Sec. Litig.*, 110 F. Supp. 2d 1183, 1192 (S.D. Iowa 2000) (citing authority predating the PSLRA). Other courts have tempered somewhat the literal requirements of "information and belief" pleading under Section 21D(b)(1), allowing reliance on an anonymous source if "accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge." *Wietschner v. Monterey Pasta Co.*, No. C 03-0632 MJJ, 2003 WL 22889372, at *6 (N.D. Cal. 2003); *see also Green Tree*, 270 F.3d at 67 (noting in dicta that *Novak v. Kasaks*, 216 F.3d 263,

313-14 (2d Cir. 1996), held that 21D(b)(1) "does not literally require pleading of all facts, so long as facts pleaded provide adequate basis for believing statements were false"). Paraphrasing the requirements under this more lenient interpretation, to satisfy Section 21D(b)(1) for allegations not based on personal knowledge plaintiffs must (1) specify every misleading statement made by defendants, (2) state why each was misleading, and (3) say **how they know** defendant's statements were made, and were false or misleading when made, by giving all of their sources of information, or at least enough particular facts to support a reasonable conviction that their sources are reliable.

Section 21D(b)(2) provides that for all private securities actions including fraud, a complaint must, with respect to each alleged act or omission, "state with particularity facts giving rise to a strong inference that defendant acted with [scienter]." 15 U.S.C. § 78u-4(b)(2). While there is disagreement among circuits as to exactly what "strong inference of scienter" requires, *see Green Tree*, 270 F.3d at 654-660, the Eighth Circuit looks for various "badges of fraud" to determine whether the complaint sets forth facts that "give a *strong* reason to believe there was reckless or intentional wrongdoing," including but not limited to "motive and opportunity." *Navarre*, 299 F.3d at 745 ("This standard is not satisfied through any one particular method . . . but rather through various criteria developed throughout the circuits that look for badges of fraud."). In addition to looking at scienter attached to individual statements, the courts consider whether "the totality of [p]laintiff's scienter allegations, even though individually lacking, are sufficient" to create a strong inference of the required state of mind. *Wietschner v. Monterey Pasta Co.*, No. C 03-0632 MJJ, 2003 WL 22889372, at *11 (N.D. Cal.

November 4, 2003) (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002)); *see also Green Tree*, 270 F.3d at 660 (looking to whether allegations "collectively add up to the required state of mind").

While the questions of whether a complaint has sufficiently plead fraud under Section 21D(b)(1), and scienter under 21D(b)(2) are analytically distinct inquiries, in reality the same facts supporting **fraud** (by alleging that a statement was false or misleading when made) will sometimes also support **scienter** (by giving rise to a strong inference that defendant knew they were false). *See, e.g.*, *Navarre*, 299 F.3d at 746 (noting that "one 'classic' fact pattern giving rise to a strong inference of scienter is that defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate"). Thus, this Court previously summarized the heightened pleading standards of the PSLRA collectively to require the complaint to specify the "who, what, when, where, and how" of the alleged fraud. *In re Digi Int'l Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1096 (D. Minn. 1998) (borrowing analysis from cases decided under Federal Rule of Civil Procedure 9(b)).

## III.   HEIGHTENED PLEADING STANDARD IN THIS CASE

The Court first notes that all material allegations in plaintiff's complaint are made "on investigation of counsel."[10] (Compl., Unnumbered Opening Paragraph). As discussed above, allegations not based on personal knowledge are considered pled on information and belief, including allegations made "on investigation of counsel."

---

[10] The only allegations not made on investigation of counsel are the identity of the two lead plaintiffs. (Compl., Unnumbered Opening Paragraph, ¶¶ 8, 10.)

*Feasby*, 2003 WL 22976327 at *4.  Thus, 21D(b)(1) requires that plaintiffs not only specify all of Retek's misleading statements and say why they are misleading, but that they "state all particular facts on which their belief is formed," that is, either give all of their sources of information or at least enough particular facts to support a reasonable conviction that their sources are reliable.

As plead, the complaint does not satisfy this requirement. Plaintiffs' initial allegations, that  Retek made false statements relating to deals with A&P and IBM, seem specific, but provide no hint as to their sources of information.  With regard to the alleged overstatement of Retek's 2Q 01 revenue in its 10-Q due to premature recognition of revenue from the A&P contract, plaintiffs do not say how they know the contract was a "percentage-of-completion" rather than a straightforward "ratable revenue recognition" contract, or that 30% of the contract was actually completed while 70% was "improperly" recognized.  Plaintiffs do not provide enough corroborating details to convince the Court that their sources are reliable without identifying them.  *See Monterey Pasta Co.*, 2003 WL 22889372 at *6.  As defendants point out, plaintiffs claim defendants "manufactured false documents" yet "provide no inkling as to what documents Retek fraudulently created," or the nature of the work Retek failed to complete.  (*See* Motion to Dismiss at 7–8.)  Similarly, plaintiffs do not give their source for Effertz's and Thomas's supposed admission at the board meetings that the books had been doctored and fraud had been committed (*see* Comp. ¶ 45), which if reliable might cure the defects in their A&P

pleading.[11]   Similarly, plaintiffs' allegations that Retek knowingly touted a "failed" alliance with IBM lacks support.   While the complaint adequately pleads that Retek promoted its IBM alliance after October of 2001, and says why the contract was a failure, plaintiffs do not tell the Court **how they know** the contract was doomed to failure. Again, plaintiffs have neither given their source of information, or plead sufficient facts about their informant to give the Court reason to believe that their information is reliable. While neither the A&P nor the IBM allegations can be characterized as "catch-all or blanket assertions," *see Navarre*, 299 F.3d at 741 (quotations omitted), they nonetheless fail the requirements the PSLRA imposes on allegations plead on information and belief. Section 21D(b)(1) requires that plaintiffs show their work when making allegations not based on their personal knowledge, and they have not done so.

Plaintiffs' allegations that Retek promoted deals with MAI and AOL after it knew these deals had failed are even less substantiated.   Plaintiffs fail to say how they know that the MAI deal was "scrapped" by February 2002, that the AOL was terminating a portion of its service, or that it was losing $200,000 each month on its deal with PRI. But these allegations suffer from a greater flaw.   Setting aside the issue of allegations made on information and belief, the complaint does not meet even the basic requirements of 21D(b)(1) as to these allegations.   As defendants point out, the complaint does not allege any statements were made about PAI or MAI or indicate why Retek had a specific duty to

---

[11]   These alleged admissions seem to more directly support scienter rather than the underlying fraud.   But if these admissions, however implausible they seem, did in fact occur, such a clear demonstration of defendants' *knowledge of fraud* provides a reason to believe that the 10-Q statements for 2Q 01 were in fact misleading.   *Cf. Navarre*, 299 F.3d at 746.

disclose facts about its dealings with these two companies. (Motion to Dismiss at 10.)  In their opposition brief, plaintiffs suggest that a $4 million increase in deferred revenue in reported for 1Q 02 was in fact a (false) statement about anticipated revenue from MAI but plaintiffs do not plead any facts to connect this $4 million figure to MAI.  While Retek did explicitly promote its deal with AOL, the complaint claims only that "[a]t the time of the Company's first quarter 2002 press release, in which the company promotes AOL as a client, AOL was **in the process** of terminating Retek's **web-based service**." (Compl. ¶ 77(b) (emphasis added).)  Ignoring the fact that this statement lacks a credible source, just because Retek made optimistic statements about AOL while AOL was "in the process" of terminating some portion of its contract, it does not follow that the optimistic statements were misleading when made without more information.  Thus, the allegations about Retek's fraudulent "statements" about MAI, AOL, and PRI do not plead sufficient facts to support their allegations that statements were in fact made, or that statements made were in fact misleading, to satisfy the first two requirements of Section 21D(b)(1).

Plaintiffs' final set of allegations are of a different nature from the first three. Rather than claiming misstatements with respect to any specific account or arrangement, plaintiffs allege that defendants knowingly exaggerated the profitability of their enterprise.  As noted above, this seems to be the overarching theme of the complaint. Plaintiffs claim that defendants repeatedly touted the health of their "sales pipeline," reported upward trends in bookings, and consistently reported positive revenue indicators, when in fact they knew the pipeline was weak, bookings were down, and that a substantial decline in revenue was inevitable.  There are two aspects to these

allegations, each of which must satisfy the requirements of Section 21D(b)(1):  (1) that Retek in fact made claims touting the strength of its sales pipeline, and (2) that these claims were misleading.  Because these allegations are made on information and belief, plaintiffs must give their sources of information or enough facts to show their sources are reliable.  Plaintiffs adequately plead that Retek made the bulk of the statement plaintiffs attribute to it.[12]

The problem with plaintiffs' allegations is that they do not demonstrate defendants' statements were false or misleading when made.  The complaint makes such claims as "Retek's sales pipeline was weak as defendants saw a lengthening sales cycle and downward trend in sales" due to customers delaying their orders.  (Compl. ¶¶ 64(a), 77(a).)  But aside from pointing to a handful of individual deals that were not going well, plaintiffs provide no specific facts to support its allegation of a downward trend. Plaintiffs claim that the manner in which Retek recognized revenue gave them sufficient visibility into the future that they must have known about the problems they announced on July 8, 2002 by the second half of 2001. (Compl. ¶¶ 90-91.)  The complaint provides a chart, showing that the licensing revenue dropped significantly from 2Q 02  to 3Q 02, and state that "[g]iven Retek's ratable revenue recognition model—in which revenue

---

[12] Defendants claim these statements are predictions of future performance, and are protected by the safe harbor for forward looking statements. (*See* Motion to Dismiss at 14–16 (citing § 21E of the Exchange Act, 15 U.S.C. § 78u-5(c) (enacted as part of the PSLRA).)  The Court does not agree that the complaint attacks defendants' forward looking statements. Plaintiffs' claim is that defendants possessed information that made their statements about the **present health of their enterprise** misleading when made.  To the extent that certain allegations pertain to forward looking statements, their claim is not that the predictions were wrong (that forward looking statements were "false"), but that the company was in possession of information that it was under a duty to disclose to make representations to the market not misleading.  For example, plaintiffs claim a specific duty arose under Item 303 of Regulation S-K.

from a contract is spread equally ove r the term of the agreement . . . the sharp $19 million drop-off between 2Q 02 and 3Q 02 further establishes that Retek's quarterly sales suffered during the second half of 2001.  (*Id.*)  This is an interesting theory, but plaintiffs do not set it forth with sufficient clarity to disprove defendants' claim that bad news issued on July 8, 2002 was the result of defendants' failure to close deals in the previous quarter.  If anything, the fact that Retek adjusted its guidance for 2003, but not Q3 or Q4 of 2002 (Compl. ¶ 84 (quoting the press release issued July 8, 2002, the last day of the class period)), seems to support the Retek defendants' claim that they announced a relatively contemporaneous shortfall on that day.  Beyond relying on Retek's revenue recognition model generally to prove defendants had advance notice of ominous trends, the complaint provides examples of specific troubled accounts (*e.g.* MAI and PRI), and claims that these shows Retek's pipeline was week.  But showing isolated examples of unprofitable accounts does not prove that Retek's sales pipeline was weak or that their bookings were trending downward.

In their reply brief, defendants note that paragraphs 37 through 39 of the complaint "allege that Retek kept reports detailing the quantity and size of potential deals in the "pipeline," as well as the probability of closure," but that they never say anything about the contents of these reports, or give any other facts about the status of Retek's sales cycle.  (Corrected Reply Brief at 3.)  Of course, plaintiffs probably did not say anything about the contents of these quarterly bookings reports because they cannot discover their contents without first satisfying the heightened pleading standards, which may be impossible without the contents of the quarterly bookings reports showing the actual state

of plaintiffs' business.  Such is the "Catch-22" of the PSLRA.  *See* generally Weiss and

Moserc, *Enter Yossarian: How to Resolve the Procedural Catch-22 That the Private*

*Securities Litigation Reform Act Creates*, 76 Wash. U. L.Q. 457 (1998). Nonetheless,

defendants are correct that plaintiffs fail to plead specific facts showing that defendants'

pipeline was in fact week, let alone give their sources for this claim plead on information

and belief.  These are precisely the sort of "catch-all or blanket assertions" courts are

required by Section 21D(b)(1) to disregard.  *Navarre*, 299 F.3d at 741.  Because plaintiffs

cannot show defendants' business was actually trending downward, general allegations

that Retek exaggerated the profitability of its enterprise are insufficiently plead.

## CONCLUSION

Because none of plaintiffs' allegations, pled on information and belief, satisfy the

requirements of Section 21D(b)(1) , the complaint is dismissed with leave to amend.  *See*

15 U.S.C. § 78u-4(b)(1).  The Court does not reach the question of scienter, that is,

whether the complaint pleads facts with sufficient particularity to give rise to a strong

inference of scienter as required by Section 21D(b)(2). 15 U.S.C. § 78u-4(b)(2).  Because

this Court must eventually look at the totality of plaintiffs' allegations to determine

whether they "collectively add up to the required state of mind," *Green Tree*, 270 F.3d at

660, and it does not yet know which, if any, of plaintiffs' allegations can be bolstered,

examining scienter is not fruitful at this time.  Similarly, analysis of the other issues

raised by defendants is postponed until if and when plaintiffs have satisfied the

heightened pleading standard set forth in the PSLRA.

## ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendants' Motion to Dismiss [Docket No. 41] is hereby **GRANTED**.

2.     Plaintiffs' consolidated class complaint [Docket No. 24] is **DISMISSED WITHOUT PREJUDICE**.

3.     Plaintiffs shall have **thirty (30) days from the date of the issuance of this Order** in which to serve a Second Amended Complaint in compliance with the Reform Act's pleading requirements.  Failure to file a Second Amended Complaint by this date will result in the Amended Complaint being dismissed with prejudice and the case being closed.


DATED:   March 30, 2004
at Minneapolis, Minnesota.

_____ s/ John R. Tunheim _____
JOHN R. TUNHEIM
United States District Judge