## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

IN RE: RETEK INC. SECURITIES, *et al.*          Civil No. 02-4209 (JRT/SRN)

**ORDER DENYING
DEFENDANTS' MOTION FOR
JUDGMENT ON THE PLEADINGS**

David R. Stickney and Benjamin Galdston, **BERNSTEIN, LITOWITZ, BERGER & GROSSMAN, LLP**, 12544 High Bluff Drive, Suite 150, San Diego, CA 92130; Gregg M. Fishbein, **LOCKRIDGE GRINDAL & NAUEN**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401, for plaintiffs.

Richard L. Gallagher, James E. Burns, Jr., **ORRICK HERRINGTON & SUTCLIFFE**, 400 Howard Street, San Francisco, CA 94105; William D. Schultz, **MERCHANT & GOULD**, 80 South Eighth Street, Suite 3200, Minneapolis, MN 55402; James C. Maroulis, **ORACLE CORPORATION**, 500 Oracle Parkway, Redwood Shores, CA 94065, for defendants.

This class action securities fraud case is before the Court on defendants' motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). On March 7, 2005, the Court granted in part defendants' motion to dismiss plaintiffs' Amended Consolidated Complaint (the "Amended Complaint"). Defendants now contend that a new Supreme Court case, *Dura Pharms., Inc. v. Broudo*, __ U.S. __, 125 S. Ct. 1627 (2005), requires the dismissal of the remainder of the Amended Complaint because it fails to adequately plead loss causation. Defendants also request that the Court take judicial notice of

several documents.  For the reasons set forth below, the Court denies defendants' motion and declines to take judicial notice of the documents.

## BACKGROUND

A more complete description of the facts underlying this case may be found in the Court's previous orders addressing defendants' motions to dismiss.  *In re Retek*, 2005 WL 1430296 (D. Minn. Mar. 7, 2005); 2004 WL 741571 (D. Minn. Mar. 30, 2004). For the purposes of the present motion, the Court will summarize from these previous orders and address mainly those facts relevant to the current motion.

According to the Amended Complaint, defendant Retek, Inc. ("Retek") sells supply-chain software to retail companies, primarily to a limited pool of large retailers. In order to remove the "peaks and valleys" of reported revenues, Retek recognizes revenue "ratably" for most of its sales.   To do this, Retek sells perpetual license agreements for its software and contracts to provide "technical advisory services."  Retek then recognizes revenue from the contract in equal parts throughout the term of the technical advisory services.  The terms of such contracts vary from 12 to 36 months, with 18 months being a typical span.   Similarly, according to plaintiffs, Retek would sometimes modify software code for a specific customer, in which case it recognized revenue using a "percentage of completion" method.  According to this method, Retek would recognize revenue as certain milestones were met.  As a result, during the class period Retek claimed that well over half of its revenue was consistently under contract two quarters out and expressly touted the advantages of this "visibility."

Plaintiffs are a class of persons and entities who purchased or acquired Retek stock between July 19, 2001 and July 8, 2002 (the "class period"). Plaintiffs' surviving claims rest on misrepresentations concerning four specific business deals: (1) defendants prematurely recognized revenue from a contract with A&P, a grocery chain, in violation of Generally Accepted Accounting Principles; (2) defendants claimed that AOL was a new customer even when they knew Retek had lost AOL as a customer; (3) defendants made positive statements about Retek's alliance with IBM even though they knew the alliance was dead at the time; and (4) defendants valued Retek's Multi Asia, Inc. ("MAI") stock at $4 million and placed that stock in its deferred revenue category, but failed to report the difficulties with its joint venture with MAI.

On July 8, 2002 (the last day of the class period), defendants issued a press release stating, in relevant part:

> The Company saw sales cycles extend as a result of working with larger customers that have more complex and lengthy procurement processes. The total amount of license revenue that was anticipated to close, but delayed or deferred, was approximately $30 million. As a result, deferred revenue is expected to decline approximately $13 to $14 million. This reduction includes the balance sheet reversal of $4 million in non-cash deferred revenue associated with Multi Asia Inc. (MAI), a Hong Kong-based exchanged focused on the Chinese retail and supplier market.
>
> The Company now expects third quarter software license revenue of $36 to $38 million, total revenue of $52 to $54 million, and operational earnings of $0.02 to $0.04 per share. Entering the third quarter, the Company had over 70% of the revised license revenue objective for the quarter under contract.
>
> *       *       *
>
> For the full year 2002, the Company is revising operational earnings guidance to be in the range of $0.25 to $0.30 per share, with total revenue

in the range of $215 to $230 million.  Until the Company can determine the
future trend and volume of deal closings, it is withdrawing its previous
guidance for 2003.

The next day, Retek's stock value declined from $17.31 to $6.46 per share.

## ANALYSIS

### A.     Standard of Review

Judgment on the pleadings under Fed. R. Civ. P. 12(c) is appropriate only where

the moving party has clearly established that there are no material issues of fact and the

moving party is entitled to judgment as a matter of law.  *Pothoff v. Morin*, 245 F.3d 710,

715 (8th Cir. 2001).  The Court must accept as true all facts as pleaded by the non-moving

party and grant all reasonable inferences in that party's favor.  *Id.*  If the parties present

and the Court does not exclude matters outside the pleadings, the motion will be treated

as one for summary judgment under Fed. R. Civ. P. 56, and all parties must have a

reasonable opportunity to present all material pertinent to such a motion.  Fed. R. Civ. P.

12(c).

### B.     The *Dura* Case

Defendants argue that the Supreme Court's reasoning in the recent *Dura*

*Pharmaceuticals* case, and subsequent lower court decisions interpreting *Dura*, indicates

that they are entitled to judgment on the pleadings in their favor.  In *Dura*, the plaintiffs

alleged that the defendants made false statements concerning profits from drug sales and

future FDA approval of a new asthmatic spray device.  *Dura*, 125 S. Ct. at 1630.  When

the company announced that its earnings from drug sales would be lower than expected,

its shares lost almost half their value.  *Id.*  Approximately eight months later, the company announced that the FDA would not approve its new asthmatic spray device.  *Id.* The company's share price fell temporarily but almost fully recovered within one week. *Id.*  The District Court dismissed the complaint on the basis that the drug profitability claim failed to allege the requisite state of mind and the asthmatic spray device claim failed to adequately allege loss causation.  *Id.*  The Ninth Circuit reversed the dismissal of the asthmatic spray device claim, holding that the plaintiffs' allegation of a fraudulently inflated stock price on the date of purchase was sufficient to plead loss causation.  *Id.* Only the claim concerning the asthmatic spray device was at issue before the Supreme Court.  *Id.*  The Court reversed, holding that an allegation of an inflated purchase price alone is insufficient to plead loss causation.  *Id.* at 1634.

Since *Dura*'s publication in April, a number of courts have read it to require that a corrective disclosure reveal to the market the falsity of the previous fraudulent statements.  *See, e.g., In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 587 (D.  Md. 2005); *In re Initial Pub. Offering Sec. Litig.*, 2005 WL 1162445, at *3-4 (S.D.N.Y. May 6, 2005); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) (pre-*Dura* case discussing disclosure).  Without such a disclosure, these courts observe, a subsequent fall in stock value cannot be causally connected to the alleged fraud.  *Dura* does not explain how specific such a disclosure must be, however.

### 1.     The Amended Complaint's Loss Causation Allegations

Defendants point to language in the Amended Complaint that is similar to that which the Court found insufficient in *Dura*:   that the plaintiffs purchased stock at artificially inflated prices and "were damaged thereby."  Am. Compl. at ¶ 109.  The *Dura* Court acknowledged, however, that Fed. R. Civ. P. 8 simply requires a "short and plain statement of the claim showing that the pleader is entitled to relief," and that it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 125 S. Ct. at 1634.

While it is true that plaintiffs use the same boilerplate language as that found insufficient in *Dura*, it is also clear that defendants are fully aware that plaintiffs claim the July 8 press release as a corrective disclosure and the subsequent fall in stock value as their economic loss.  The Amended Complaint sets forth specific allegations concerning all these matters.  At oral argument, in response to plaintiffs' request for permission to amend the complaint again should it be found insufficient, defendants argued that the problem with the complaint is not a technical, but a substantive one.  Thus, the Court concludes that defendants do not object to the lack of a specific incantation in Count I expressly stating that the July 8 press release constituted the corrective disclosure upon which plaintiffs' loss causation allegations are based.  If such were the case, the Court would grant plaintiffs leave to amend, but as the parties are perfectly capable of framing the issues correctly, the Court does not believe any amendment is necessary.

2.      **The A&P, IBM, and AOL Allegations**

Defendants argue that because the July 8, 2002 press release does not address the subject of three of the four alleged misrepresentations, namely, those concerning A&P, AOL, and IBM, plaintiffs have not pleaded and cannot, as a matter of law, prove loss causation. Plaintiffs argue that the disclosure of Retek's worsening financial health and its balance sheet reversal of the $4 million in MAI stock are "inextricably linked" to Retek's misrepresentations concerning the A&P contract, the alliance with IBM, and the lost AOL account. Plaintiffs contend that all these misrepresentations were part of a broader scheme that "began to be disclosed" with the July 8 press release.

While the thread of causation may be long and somewhat tortured, at this stage, where the Court must accept as true the allegations in the Amended Complaint, the Court finds that plaintiffs have alleged enough to survive *Dura*. While defendants claim that this case is practically identical to *Dura*, in reality there is an important difference. The corrective disclosure in *Dura* concerned the defendant's lower expected earnings due to slow drug sales, but the claim that was dismissed involved a completely separate product, the asthmatic spray device. *Dura*, 125 S. Ct. at 1631. There was no apparent logical connection, nor, apparently, did the plaintiffs attempt to draw such a connection, between the stock drop that followed the earnings announcement and the defendants' false statements concerning FDA approval of the device.

Similarly, defendants urge the Court to compare the facts of this case to a recent case, *In re Compuware Securities Litigation*, 386 F. Supp. 2d 913, 2005 WL 2258625 (E.D. Mich. 2005). While the court in *Compuware* discussed the disclosures, it

ultimately dismissed the complaint because it was undisputed that the lead plaintiffs had sold all their stock well before any disclosure and subsequent drop in stock price occurred.  *Id.* at *6.  In such a case, as the *Dura* Court observed, there can be no loss. *Dura*, 125 S. Ct. at 1631 (stating that if "the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.").

In contrast to *Dura* and *Compuware*, here plaintiffs' allegations include a straightforward scenario perfectly consistent with what *Dura* requires:  an allegedly corrective disclosure followed by a drop in the stock price during the time that plaintiffs owned the securities.  Unlike in *Dura*, the misrepresentations at issue here concern the same products and sales that are the subject of the July 8, 2002 press release.  Plaintiffs also allege that Retek recognizes revenue ratably over time, sometimes over periods as long as 36 months.  There is thus a possible temporal and subject matter connection between the July 8 press release and the previous alleged misrepresentations that was completely missing in *Dura*.  *See also In re Daou Sys., Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005) (finding that plaintiffs had adequately alleged loss causation where defendants revealed the company's "true financial condition.").

Defendants argue that any communication from a corporation concerns its "financial condition" and that permitting plaintiffs to proceed with their claims in this case would indicate that *any* communication could serve as a sufficient corrective disclosure for purposes of pleading.  The Court disagrees.  As the Ninth Circuit noted in *Daou*, the revealed figures disclosed the company's *true* financial condition.  *Id.*  As

such, they were at odds with the defendants' previous alleged misrepresentations concerning its financial condition.

In light of the fact that this is a motion for judgment on the pleadings, not a summary judgment motion, the Court is unable to say that there are no material factual issues here. Of course, as the *Dura* Court observed, the more remote in time from the ultimate disclosure, the less likely it is that the previous misrepresentations had anything to do with the ultimate loss. *Dura*, 125 S. Ct. at 1632. Plaintiffs may well have a difficult time proving that the delayed and deferred revenue in the July 8, 2002 disclosure was connected to the allegations concerning A&P, IBM, and AOL. But "ordinary pleading rules are not meant to impose a great burden upon a plaintiff." *Dura*, 125 S. Ct. at 1634. Plaintiffs have met that burden here.

### 3.      The MAI Allegations

Finally, defendants argue that by the time of the July 8 disclosure, the market already knew about a possible $4 million balance sheet reversal due to problems with the MAI joint venture, because a market analyst discussed this in an April 18, 2002 report. Defendants ask the Court to take judicial notice of this report, to which the Amended Complaint refers, as well as the underlying district court opinion in *Dura* and press releases and screen printouts from Retek's public website. The Court declines to take judicial notice of these documents because it would be inappropriate at this stage, without the benefit of a full record, to determine as a matter of law that the April 18 report made the July 8 press release redundant.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that defendants' motion for judgment on the pleadings [Docket No. 120] is **DENIED**.

DATED:    October 21, 2005                           _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                 United States District Judge