## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| **In re RETEK INC.**<br>**SECURITIES LITIGATION** | Civil No. 02-4209 (JRT/SRN) |
| This Document Relates To: | **MEMORANDUM OPINION**<br>**AND ORDER** |
| ALL ACTIONS | |

David R. Stickney and Benjamin Galdston, **BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP – SD**, 12481 High Bluff Drive, Suite 300, San Diego, CA 92130; Ex Kano S. Sams, II, **LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP – SF**, 100 Pine Street, Suite 2600, San Francisco, CA 94111; Gregg M. Fishbein, **LOCKRIDGE GRINDAL NAUEN PLLP**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401-2179; for plaintiffs.

James E. Burns, Jr. and Heidi E. Koh, **ORRICK HERRINGTON & SUTCLIFFE – SF**, 405 Howard Street, San Francisco, CA 94105; Allen W. Hinderaker, **MERCHANT & GOULD PC**, 80 South Eighth Street, Suite 3200, Minneapolis, MN 55402; for defendants.

This is a class action lawsuit alleging securities fraud against Retek Inc. and five individuals alleged to be insiders of Retek.[1] The lead plaintiffs are the Louisiana Municipal Police Employees' Retirement System and Steven B. Paradis. This matter is before the Court on defendants' motion to dismiss plaintiffs' second amended consolidated class action

---

[1] The individually named defendants are John Buchanan, Chairman of Retek's Board of Directors and former Chief Executive Officer; Steven D. Ladwig, Chief Executive Officer of Retek during the class period; Gregory A. Effertz, Senior Vice President and Chief Financial Officer; Jeremy P.M. Thomas, Chief Technology Officer; and James B. Murdy, Retek's Controller.

complaint ("SAC").  For the reasons discussed below, the motion is granted in part and denied in part.  The motion is granted with prejudice respect to the claims regarding AOL and the negative trend allegations, and with respect to the Rule 10b-5 claim against defendant Steven D. Ladwig.  The Court also concludes that five of the statements allegedly made by defendants are not actionable.  The motion is denied in all other respects.

## BACKGROUND

Retek is a company that develops and markets supply chain software to retail companies.  *See In re Retek Inc. Sec. Litig.* ("*Retek I*"), 2004 WL 741571, at *2-4 (D. Minn. Mar. 30, 2004) (providing a more complete discussion of the case background).  The lead plaintiffs are the Louisiana Municipal Police Employees' Retirement System and Steven B. Paradis.  Lead plaintiffs were appointed pursuant to Section 21D of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u-4, for the persons and entities that purchased stock in Retek's corporation between July 19, 2001 and July 8, 2002 (the "class period").  For the purposes of a motion to dismiss, the facts in the complaint are assumed to be true.  *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 738 (8th Cir. 2002).

On July 8, 2002, the last day of the class period, Retek issued a press release announcing that it had failed to close more than $30 million worth of licensing contracts it had anticipated would close during the second quarter of 2002, and accordingly adjusted downward several predictions it had made for the following quarter.  The next day, Retek's stock fell from $17.31 to $6.46 per share.

In their complaint, plaintiffs allege that Retek, acting through the individually named defendants, made materially false statements and omissions during the class period that artificially inflated the value of its stock, in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiffs claim that each of the individually named defendants is individually liable under these provisions as direct participants in the fraud. Plaintiffs further allege that each of the individually named defendants is liable under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

On March 30, 2004, this Court granted defendants' motion to dismiss plaintiffs' original complaint on the ground that plaintiffs' allegations, pled on information and belief, did not satisfy the heightened pleading requirements of Section 21D(b)(1) of the Exchange Act, 15 U.S.C. § 78u-4(b), enacted as part of the Private Securities Litigation Reform Act of 1995 ("Reform Act"). *See Retek I*, 2004 WL 741571, at *6-9. The Court found that the complaint did not specifically plead the facts giving rise to defendants' alleged fraud, nor did it state with particularity all the facts on which the plaintiffs' allegations were formed. *Id.* The plaintiffs filed an amended complaint attaching fifteen pages of interview summaries from seventeen confidential witnesses ("CWs") in an attempt to meet the heightened pleading requirements.

On March 7, 2005, this Court granted in part defendants' motion to dismiss the amended complaint. *In re Retek Inc. Sec. Litig.* ("*Retek II*"), 2005 WL 1430296 (D. Minn. Mar. 7, 2005). Specifically, the Court granted the motion to dismiss the negative sales trend allegations. Plaintiffs argued that Retek's deteriorating sales environment made it fraudulent for Retek in 2001 and 2002 to make optimistic statements regarding its business and

- 3 -

prospects, but the Court held that plaintiffs failed to plead that such a negative sales trend occurred. The Court also dismissed the claims in regards to the failed joint venture with Performance Retail because plaintiffs did not allege any false statements made by defendants about this venture.[2] The Court denied the motion to dismiss in all other respects. In so holding, the Court found that plaintiffs had sufficiently alleged that defendants made false statements regarding the IBM alliance, Multi-Asia ("MAI"), AOL, and A&P.

In an Order dated October 21, 2005, the Court denied defendants' motion under Rule 12(c). Defendants argued that plaintiffs' theory of loss causation was identical to that rejected by the United States Supreme Court. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005). The Court denied the motion but noted that plaintiffs' fraud theory rested upon a thread of causation that is "long and somewhat tortured." *In re Retek Inc. Securities*, 2005 WL 3059566, *4 (D. Minn. Oct. 21, 2005). On March 22, 2006, the Court granted plaintiffs' motion to certify class.

In an Order dated April 24, 2006, the Magistrate Judge granted plaintiffs leave to file the SAC. On September 26, 2006, the Court heard oral argument on defendants' motion to dismiss the SAC.

---

[2] Plaintiffs plead no additional facts regarding Performance Retail in the second amended consolidated class action complaint. To the extent that plaintiffs seek to base claims on these allegations, the claims are dismissed.

**ANALYSIS**

## I.      SECTION 10(b) AND RULE 10b-5

There are five elements of a successful claim under Section 10(b) and Rule 10b-5. Plaintiffs must demonstrate (1) misrepresentations or omissions of material fact that operated as a fraud or deceit; (2) causation; (3) damages; (4) fraudulent activity in connection with the purchase or sale of a security; and (5) scienter, or intent to deceive, manipulate, or defraud. *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 741 (8th Cir. 2002) (citations omitted) (noting that scienter is an essential element of a 10b-5 claim although not explicitly mentioned in the text of the rule).  Defendants dispute in this motion only that the SAC adequately alleges false and misleading statements and scienter.

## II.     THE HEIGHTENED PLEADING STANDARD

The allegations of false and misleading statements and scienter must satisfy the special pleading standards under Section 21D(b)(1) of the Exchange Act.  Section 21D(b)(1) provides that "the complaint shall specify each statement alleged to have been misleading" and give "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1). Section 21D(b)(1) further provides that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  *Id.*  To satisfy Section 21D(b)(1) for allegations not based on personal knowledge, plaintiffs must: (1) specify every misleading statement made by defendants; (2) state why each was misleading; and (3) explain how they know defendants' statements were made, and were false or misleading when made, by giving all of their

sources of information, or at least enough particular facts to support a reasonable conviction that their sources are reliable. *In re Retek I*, 2004 WL 741571, at *5.

## III.    FALSE AND MISLEADING STATEMENTS

Plaintiffs attempt to show that the price of the stock dropped as a result of fraud in two ways. First, plaintiffs allege that a negative sales trend made it fraudulent for Retek to make optimistic statements about the company. Second, plaintiffs attack a variety of deals, projects, and accounting issues. These include a failed alliance with IBM, joint ventures with MAI, and deals with A&P and AOL.

### A.    Negative Trend Allegations

In its original complaint, plaintiffs claimed that "defendants repeatedly touted the health of their 'sales pipeline,' reported upward trends in bookings, and consistently reported positive revenue indicators, when in fact they knew the pipeline was weak, bookings were down, and that a substantial decline in revenue was inevitable." *Retek I*, 2004 WL 741571, at *8. In the Order dated March 24, 2004, the Court found that the "problem with plaintiffs' allegations is that they do not demonstrate defendants' statements were false or misleading when made." *Id.*

Plaintiffs' amended complaint included statements from CWs that painted a negative picture of Retek's financial situation. CW2 stated that fewer deals were being closed, that it was taking longer to close deals, and that management told sales personnel that lay-offs were likely unless more deals were closed. CW6 stated that, in June 2002, none of the food and drug salespeople had met their sales quotas for the quarter. CW13 stated that, in 2001,

Retek's Performance Retail account cost approximately $200,000 a month in software development with no revenue coming in. In the Order dated March 7, 2005, the Court found that these statements were still not specific enough to show that defendants' statements were false or misleading when made. *Retek II*, 2005 WL 1430296, at *4. The Court therefore granted defendants' motion to dismiss on the negative trend allegations. In the SAC, plaintiffs add negative trend allegations in an effort to cure the deficiencies that the Court identified in the amended complaint.

Defendants first argue t hat plaintiffs should not be allowed to resurrect this claim. In the Order dated March 7, 2005, the Court did not specify whether it dismissed the claim with or without prejudice, but defendants argue that dismissal with prejudice was required given the policy served by the Reform Act. Specifically, defendants argue that plaintiffs should be forced to plead fraud based upon the sources they had when they commenced the case.

The Reform Act imposes an automatic discovery stay, which seeks "to avoid the situation in which a plaintiff sues without possessing the requisite information to satisfy the Reform Act's heightened pleading requirements, then uses discovery to acquire that information and resuscitate an otherwise dismissible complaint." *In re Comdisco Secs. Litig.*, 166 F. Supp. 2d 1260, 1263 (N.D. Ill. 2001). Here, the Court sustained several of plaintiffs' claims and then the discovery stay was lifted. Plaintiffs amended their complaint with information produced by defendants relating to claims that the Court sustained. After the cost of discovery has been incurred, allowing plaintiffs to use the information produced to amend their complaint does not frustrate the policy underlying the Reform Act. *See, e.g.*, *In re Southern Pac. Funding Corp. Sec. Litig.*, 83 F. Supp. 2d 1172, 1175 (D. Or. 1999).

Dismissal with prejudice was not required, and the Court sees no reason to ignore the additional allegations on the negative trend allegations.

Defendants argue in the alternative that the allegations in the SAC still do not establish a negative sales trend.  Plaintiffs try to establish a negative sales trend by pointing to six failed deals.  Plaintiffs also point to the "U"-shaped curve of the volume of license sales – a preclass decline followed by a gradual increase during the class period.  Although defendants made no statements specific to the volume of license sales, plaintiffs assert that defendants' generally optimistic statements were misleading in light of the volume of license sales.

It is clear that some aspects of Retek's business were not performing well, but the health of any company depends on a host of factors.  *See In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1083-84 (8th Cir. 2005) (holding that rosy statements about a company are not actionable because even if the company lost some deals, statements that demand was strong are not necessarily inconsistent).  While the volume of license sales for Retek declined and Retek lost several significant deals, the allegations show that the sales pipeline remained quite full.  The SAC provides no indication of the overall size and scope of the sales pipeline relative to the six examples of failed deals upon which plaintiffs rely.  Defendants may have been able to meet their goals if the six failed deals had closed.  As such, it does not follow that defendants' optimistic statements were misleading when made.  Accordingly, the Court finds that the plaintiffs do not meet the heightened pleading standard with regard to the negative trend allegations and grants defendants' motion to dismiss this claim.

### B.     IBM Alliance

In the Order dated March 7, 2005, the Court sustained plaintiffs' allegations in the amended complaint regarding the failed IBM alliance.   In the SAC, plaintiffs add allegations on this matter.  Defendants now argue that plaintiffs' additional allegations render this claim unsustainable because they show that Retek engaged in a significant amount of activity in 2002 to produce sales from the alliance with IBM.  Plaintiffs continue to allege the same facts that the Court previously found sufficient to survive a motion to dismiss, and the additional allegations do not negate the prior allegations.   As such, the Court denies defendants' motion to dismiss this claim.

### C.     MAI

In the Order dated March 7, 2005, the Court sustained plaintiffs' allegations in the amended complaint regarding the inclusion of MAI stock in reported deferred revenue.  The allegations in the SAC are not materially different from those the Court already sustained. Accordingly, the Court denies defendants' motion to dismiss this claim.

### D.     A&P

In the Order dated March 30, 2004, the Court found that "[p]laintiffs' initial allegations, that Retek made false statements relating to deals with A&P . . . seem specific, but provide no hint as to their sources of information."  *Retek I*, 2004 WL 741571, at *7.  In their amended complaint, plaintiffs included statements by confidential witnesses.  The confidential witnesses explain how they know that the A&P contract was a "percentage-of-

completion" contract, that only 30% of the contract was completed when 70% was "improperly" recognized as revenue, and that Retek had "doctored" A&P's progressive payment documents to make its numbers for the quarter. In the Order dated March 7, 2005, the Court found that plaintiffs met the heightened pleading standard with respect to the A&P allegations and denied defendants' motion to dismiss on this claim.

In its SAC, plaintiffs continue to allege that defendants falsified documents so that it appeared that more on the A&P contract had been completed than had actually been completed. The SAC, however, alleges that Retek provided its auditors with falsified documents showing the work required under the A&P contract was 100% complete, rather than 70% complete as alleged in the amended complaint. Plaintiffs continue to allege that defendants Effertz and Thomas admitted in a meeting in June 2001 that the books were doctored to make anticipated numbers.

Defendants argue that this claim must be dismissed because the confidential witness at the center of these allegations is unreliable, and because defendants can offer reasonable explanations for their behavior. Defendants' arguments are misplaced because the Court cannot make credibility determinations or resolve disputed facts in a motion to dismiss. *See Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001) ("Undoubtedly, the accounting issues are complex; whether they were handled within the parameters of good faith decision-making or whether the decisions amounted to recklessness will surely be the focus of any trial of this case."). Thus, the Court denies defendants' motion to dismiss this claim.

### E.    AOL

In their original complaint, plaintiffs alleged that Retek failed to report to the market the difficulties it had with its AOL deal.  In the Order dated March 30, 2004, the Court dismissed this claim reasoning that the allegations concerning AOL lacked credible sources and were insufficient to show that defendants' optimistic statements about the AOL deal were misleading when made.  *Retek I*, 2004 WL 741571, at *7.  In the amended complaint, plaintiffs reasserted their claims with respect to AOL.  Defendants did not address the AOL claims, so the Court allowed the AOL claims to go forward. *Retek II*, 2005 WL 1430296, at *3 n.3.

In their memorandum supporting the motion to dismiss currently before the Court, defendants fully incorporate their arguments from the first motion to dismiss.  Plaintiffs do not respond to defendants' arguments, and it appears plaintiffs have conceded these claims. The Court therefore grants defendants' motion to dismiss with respect to the AOL claims.

### F.    New "Deferred Revenue" And License Revenue Allegations – Accenture And EPAM

Plaintiffs allege that defendants improperly booked $19 million as deferred revenue and revenue from Accenture.  Specifically, plaintiffs allege that in the fourth quarter of 2001, defendants enlisted Accenture to "pre-buy" software licenses that Sainsbury had refused to buy in the quarter.  Accenture agreed to advance Retek $10.5 million so Retek could make its earning projections for the quarter.  In exchange, Retek promised to pay Accenture a $1 million commission and guaranteed that Accenture would be repaid if Sainsbury did not purchase the software.   Retek recognized $2 million as revenue in that quarter and

recognized the remaining $8.5 million as deferred revenue, without any disclosure. In the first quarter of 2002, Retek convinced Accenture to advance another $8.5 million under similar terms, and recognized $1.8 million in revenue and $6.8 million in deferred revenue. Plaintiffs argue that under the accounting rules defendants could not properly recognize the funds from Accenture as revenue or deferred revenue, without disclosure, because the payments were refundable.

Plaintiffs further allege that defendants reported an $8 million related-party loan as deferred revenue and later improperly recognized it as revenue. Plaintiffs allege that defendant Effertz instructed EPAM to back-date documents and a software receipt so that Retek could recognize $6 million of the $8 million loan as revenue in the fourth quarter of 2001 and $2 million in the first quarter of 2002. Plaintiffs argue that under the accounting rules no revenue should have been recognized prior to execution of a definitive agreement and receipt of the software, and that Retek failed to disclose that the true source of the money was a related-party loan.

Plaintiffs argue that recognition of this deferred revenue and revenue made all of Retek's financial statements during the class period false. Plaintiffs continue to allege that Retek's investors relied on Retek's deferred revenues as a proxy for license bookings, and argue that defendants therefore have a duty to disclose additional information about these dealings to prevent the deferred revenue from being misleading to investors.

Defendants fault plaintiffs for failing to identify the sources of these allegations. However, the Reform Act requires that plaintiffs must give either "all of their sources of information, or at least enough particular facts to support a reasonable conviction that their

sources are reliable." *Retek I*, 2004 WL 741571, at *5. The Court finds that plaintiffs' allegations with respect to Accenture and EPAM are sufficiently specific to meet the requirements of the heightened pleading standards and denies defendants' motion to dismiss on this claim.

## IV.    RULE 10B-5 CLAIMS AGAINST SEVERAL INDIVIDUALS

Defendants argue that the Rule 10b-5 claims against Murdy, who served as Retek's Controller, and Thomas, who served as the Chief Technology Officer, must be dismissed because neither individual made statements. Defendants further argue that the Rule 10b-5 claims against Buchanan, Chairperson of the Board of Directors, must be dismissed because the class period statements attributed to him do not relate to the subject matter in this case.

Plaintiffs have alleged that each of the individual defendants was a "hands-on manager with day-to-day involvement in Retek's operations." SAC ¶ 24. If these allegations are proven true, these individuals may be held liable for false and misleading statements contained in SEC filings and press releases as group published documents. Under the group publication doctrine, SEC filings and press releases are presumed to be "the collective work of those individuals with direct involvement in the everyday business of the company." *In re Stellent, Inc. Secs. Litig.*, 326 F. Supp. 2d 970, 983 (D. Minn. 2004) (quoting *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999)). Defendants also argue that there are no particularized facts linking Murdy, Thomas, and Buchanan to any group published statements. However, under the group publication doctrine, "the complaints need not draw a specific connection between these defendants and every alleged omission

and misrepresentation." *In re Digi Int'l Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1101 (D. Minn. 1998).

Next, defendants argue that the allegations do not show that these individuals directed any fraud. Section 10(b) and Rule 10b-5 are not limited to misrepresentations or omissions of material fact. They also make it unlawful for "any person directly or indirectly . . . to employ any device, scheme, or artifice to defraud . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Thus, liability under Rule 10b-5 attaches to persons "who had knowledge of the fraud and assisted in its perpetration." *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1471 (2d Cir. 1996). Plaintiffs' allegations place these executive officers at the center of the alleged scheme to defraud, which if proven true could show the officers assisted in the perpetration of fraud. Moreover, plaintiffs allege that these individuals engaged in substantial insider trading, where the individual defendants sold all or nearly all of their Retek stock. Trading on material, nonpublic information qualifies as a deceptive device under Section 10(b). *See No. 84 Employer-Teamster Joint Counsel Pension Trust Fund v. Am, West Airlines Inc.*, 320 F.3d 920, 937 (9th Cir. 2003).

Accordingly, the Court sustains the Section 10(b) and Rule 10b-5 claims against Murdy, Thomas, and Buchanan.

## V.    ACTIONABLE STATEMENTS

The SAC identifies 25 allegedly actionable statements. Defendants argue that most of these statements are not actionable, and group these statements into four categories:

1) analyst statements; 2) oral statements made by unidentified defendants; 3) SEC filings and press releases; and 4) oral statements made by identified defendants.

First, several of the statements in the complaint are analyst reports that include statements by defendants. Defendants can be liable for statements disseminated by analysts if defendants "used the analysts as a conduit, making false and misleading statements to securities analysts with the intent that the analysts communicate those statements to the market." *Navarre*, 299 F.3d at 743. Plaintiffs allege that defendants had conference calls and meetings with analysts, and the SAC specifies the dates of these events, what was said, and the content of the analyst reports. For example, defendants hosted an "Analyst Day" at the Hilton in Minneapolis on May 16, 2002. Plaintiffs allege that at that meeting defendants highlighted IBM's activities in co-marketing with Retek, and analysts responded by reporting about the alliance with IBM. Plaintiffs' allegations, if proven true, could show that defendants intended that the analysts communicate the statements to investors. Therefore, there is no reason to dismiss the claims based on these statements.

Second, five statements in the complaint do not identify the speaker. *See* SAC ¶ 111, 120, 124, 131, and 136. Under the Reform Act, plaintiffs must provide "particulars" about the statements, including who made the statement. *Navarre*, 299 F.3d at 743. Plaintiffs do not respond to defendants' argument on this point. The Court concludes that these allegations are insufficient under the Reform Act. As such, the statements in paragraphs 111, 120, 124, 131, and 136 provide no basis for a Rule 10b-5 claim against defendants.

Third, plaintiffs identify nine SEC filings or press releases as statements. Defendants concede that these statements are attributable to Retek, but argue that they are not

attributable to individual defendants that neither signed the statements nor were quoted in them.[3]  As explained above, these statements can be attributed to the individual defendants through the group publication doctrine.

Fourth, two of the statements are spoken statements by individual defendants.  These statements can be properly attributed only to the individuals who made them.  *See In re Tricord Sys. Sec. Litig.*, 1996 U.S. Dist. LEXIS 20943, at *56 (D. Minn. April 5, 1996) (explaining that the group pleading presumption is not available for oral statements made by individual defendants).

## VI.   SCIENTER

Section 21D(b)(2) provides that for all private securities actions including fraud, a complaint must "state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  The Eighth Circuit looks for various "badges of fraud" to determine whether the complaint sets forth facts that "give a *strong* reason to believe there was reckless or intentional wrongdoing," including but not limited to "motive and opportunity."  *Navarre*, 299 F.3d at 745.

In the Order dated March 7, 2005, the Court denied defendants' motion to dismiss for lack of scienter.  *Retek II*, 2005 WL 1430296, at *5.  The Court reasoned that the timing and nature of the alleged false statements support a strong inference of scienter.  *Id.*  The Court

---

[3] Defendants also argue that the press releases providing earnings guidance are not actionable because they are not accompanied by specific contemporaneous facts establishing actual knowledge that the predictions could not possibly be met.  The Court previously considered and rejected this argument, and sees no reason to reconsider its ruling.  *See Retek I*, 2004 WL 741571, at *8 n.12; *Retek II*, 2005 WL 1430296, at *6.

further reasoned that the allegation that almost all of the defendants sold between 92 and 100 percent of their stock during the class period also supports a strong inference of scienter.  *Id.* The Court's reasoning applies equally to the allegations in the SAC, and the Court therefore concludes that the scienter allegations in the SAC are sufficient, with one exception.  The allegations against Ladwig do not give rise to a strong inference of scienter because he never sold stock and was not at Retek for the entire class period.  As such, the Rule 10b-5 claim against Ladwig is dismissed.

## ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that defendants' Motion to Dismiss the Second Amended Consolidated Complaint [Docket No. 256] is **GRANTED IN PART** and **DENIED IN PART** as follows.

1.     The motion is **granted with prejudice** with respect to the claims regarding AOL and the negative trend allegations, and with respect to the Rule 10b-5 claim against defendant Steven D. Ladwig.  In addition, the statements in paragraphs 111, 120, 124, 131, and 136 of the Second Amended Consolidated Complaint provide no basis for a Rule 10b-5 claim against defendants.

2.     The motion to dismiss is **denied** in all other respects.


DATED:   January 3, 2007                        _____ s/ John R. Tunheim _____
at Minneapolis, Minnesota.                           JOHN R. TUNHEIM
                                                 United States District Judge